**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| VIVIAN BROWN,<br><br>Plaintiff,<br><br>v.<br><br>SOMER'S BUILDING MAINTENANCE,<br>SBM MANAGEMENT SERVICES,<br><br>Defendants. | Civil Action No. 12-3858 (JLL)<br><br>OPINION |

**LINARES,** District Judge.

This case involves allegations that Plaintiff Vivian Brown was discriminated against on the basis of her gender and/or race by her employer, and then subjected to retaliation after she filed a charge of discrimination with the EEOC. Plaintiff is proceeding *pro se* in this matter. Defendants, Plaintiff's employer, have filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. The Court has considered the submissions made in support of and in opposition to the instant motion.[1] No oral argument was heard. Fed. R. Civ. P. 78. Based on the reasons that follow, Defendants' motion [Docket Entry No. 74] is **granted.**

---

[1] The Court is in receipt of three submissions by Plaintiff in opposition to Defendants' motion. *See* Docket Entry Nos. 76, 79 and 83.

1

## BACKGROUND

Defendants have submitted a Statement of Undisputed Facts, as required by Local Civil Rule 56.1 ("Def. 56.1 Stmt."). Each of Defendants' undisputed material facts contains citations to evidence contained in the record. Despite the Court's explicit directives—contained in its Orders dated April 11, 2014 and May 9, 2014—Plaintiff has failed to provide a proper responsive 56.1 Statement. To be clear, in light of Plaintiff's *pro se* status, the Court entered an Order on April 11, 2014 affording Plaintiff with additional time—until April 21, 2014—in which to submit a responsive 56.1 Statement, as required by our local rules. *See* April 11, 2014 Order, Docket Entry No. 80. Notwithstanding this Court's April 11, 2014 Order, Plaintiff, once again, failed to file a responsive 56.1 Statement and/or a request for extension of time by April 21, 2014. Instead, on April 23, 2014 Plaintiff called my chambers and left a voicemail indicating that she had just received the Court's April 11, 2014 Order the day before. She was subsequently advised by a member of my staff to immediately submit a letter to the Court asking for any additional time she needed in order to file a responsive 56.1 Statement. On May 9, 2014, this Court entered a <u>second</u> Order directing Plaintiff to file a responsive 56.1 Statement on or before May 30, 2014. This Court's Orders were clear in stating that "Plaintiff's failure to file a responsive 56.1 Statement on the Court's docket by May 30, 2014 will result in the Court deeming each of Defendants' statements of material fact as undisputed for purposes of adjudicating Defendants' motion for summary judgment, in accordance with Local Civil Rule 56.1." *See* Docket Entry Nos. 80, 82. To date, Plaintiff has failed to file a responsive 56.1 Statement and/or a letter requesting any additional time in which to do so.

Plaintiff's failure to file a responsive 56.1 Statement violates Local Civil Rule 56.1 which requires:

> The opponent of summary judgment shall furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion; any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion.

Local Civil Rule 56.1. Thus, the local rule requires that the opponent of a summary judgment motion provide: (a) a clear indication of "agreement or disagreement" as to each statement of undisputed fact listed by the movant, and (b) if "disagreement," then a statement of each material fact in dispute *with* citation to affidavits and/or other documentation. Plaintiff has done neither. Thus, Defendants' undisputed facts "shall be deemed undisputed" for purposes of this motion.[2]

SBM[3] is a service provider in the facilities maintenance industry and has operations throughout the United States. (Def. 56.1 Stmt., ¶ 1). Plaintiff is an African American female. (*Id.*, ¶ 5). Plaintiff was hired by SBM as a lab service technician on or about February 23, 2010. Her responsibilities included delivering packages, moving laboratory and other equipment, servicing items in the laboratories, and dumping solvents. While Plaintiff performed these responsibilities for SBM, she serviced laboratories and worked in facilities run by a separate

---

[2] Although each of Defendants' statements of material fact are thus deemed undisputed for purposes of this motion, to be clear, this Court has in any event: (1) carefully reviewed the evidence in the record—including but not limited to Plaintiff's responses to Defendants' Interrogatories and Plaintiff's deposition testimony; (2) considered all facts and their reasonable inferences in the light most favorable to the Plaintiff, the non-moving party; and (3) construed Plaintiff's submissions liberally, in light of her *pro se* status.

[3] According to Defendants' 56.1 Statement, Defendant Somers Building Maintenance ("SBM") was incorrectly captioned as Somer's Building Maintenance SBM Management Services. *See* Docket Entry No. 74-9 at 1. For ease of reference, the Court will continue to refer to Defendant SBM in the plural, notwithstanding Defendant's representation that the two Defendants listed in Plaintiff's Complaint are one and the same.

3

company, Merck. The primary Merck building Plaintiff worked in was building 818. (*Id.*, ¶ 6). Plaintiff was hired by hiring manager Joe McCullough, and reported to Jeff Wurch when she began working at SBM. Plaintiff also reported to several other supervisors during her employment with SBM, including Henry Cortez and William Early. (*Id.*, ¶ 7). During the course of Plaintiff's employment with SBM she was never disciplined, written up, or suspended. (*Id.*, ¶ 8).

In conjunction with Plaintiff's employment, she joined the Service Employees International Union ("SEIU") Local 32BJ. The SEIU Local 32BJ shop steward during Plaintiff's SBM employment was Daniel Medina. (*Id.*, ¶ 9).

Troy Carolina ("Mr. Carolina") is an African American male. (Def. 56.1 Stmt., ¶ 10). Mr. Carolina was hired by SBM as a "lead"—a union position where a lab technician assists the supervisor—on March 1, 2010. Mr. Carolina was a lead within the same shift and location as Plaintiff from March 1, 2010 through August 1, 2010. During this time period, there is no record of any issues between Plaintiff and Mr. Carolina. (*Id.*, ¶ 11). On August 1, 2010, Mr. Carolina was promoted to Supervisor; as Supervisor, Mr. Carolina was not Plaintiff's direct manager. (*Id.*, ¶ 12).

Plaintiff alleges that on two separate instances prior to May 18, 2011, Mr. Carolina called her "Pocahontas" and made physical contact with her hair. (Def. 56.1 Stmt., ¶ 13). Plaintiff further alleges that she was alone during both incidents and that both incidents occurred in building 818 on the Merck property. (*Id.*). As to the first incident, Plaintiff admits that the only details she recalls are that she was wearing her hair in two braids, Mr. Carolina referred to her as "Pocahontas," and then he proceeded to pull her hair. (*Id.*, ¶ 14). In terms of the second incident, Plaintiff testified that the only details she recalls are that Mr. Carolina pulled her hair, she

responded by saying "don't pull my hair," and then Mr. Carolina responded to her by stating "I can pull your hair when I want to. You don't say nothing when Kason pulls your hair." (*Id.*, ¶ 15).

On May 18, 2011, Plaintiff and a number of other SBM lab services and janitorial employees attended a meeting, referred to at SBM as a muster meeting. (Def. 56.1 Stmt., ¶ 17). Muster meetings typically start at 7:00 a.m. or 7:30 a.m. and last for about thirty minutes. The purpose of muster meetings is to provide employees with a daily schedule and any other relevant information about the workplace on that particular day. (*Id.*). The May 18, 2011, muster meeting began at 7:00 a.m. and was run by Mr. Carolina and Mr. Cortez. (*Id.*, ¶ 18). While conducting the meeting, Mr. Carolina stood toward the middle of the room. Plaintiff sat close to the wall to Mr. Carolina's right, had chairs on both her sides, and had a table behind and in front of her. There was also another employee sitting at the table in front of Plaintiff. (*Id.*, ¶ 18). Mr. Carolina's first discussion topic was an issue regarding employees clocking in and clocking out of the office during break time. (*Id.*, ¶ 19). In response to Mr. Carolina's remarks, Plaintiff raised her hand, Mr. Carolina called on her, and she provided her input. (*Id.*, ¶ 20). Plaintiff alleges that Mr. Carolina reacted to her remarks with a verbal attack. (*Id.*, ¶ 21). However, Plaintiff admits that she does not recall any of the comments Mr. Carolina made to her, other than the fact that Mr. Carolina did not curse at her and did not make any female-related comments. (*Id.*, ¶ 21). As the meeting went on, Plaintiff testified that Mr. Carolina approached her, although he was not close enough to make physical contact with her, yelled at her, and pushed Mr. Cortez, who stepped in Mr. Carolina's path to intervene. At that point, Mr. Cortez escorted Plaintiff out of the meeting room and to Mr. Early's office. (*Id.*, ¶ 22). Both Mr.

Carolina and Mr. Cortez have since stated that several of Plaintiff's comments about the clocking in and out issue were disrespectful and inappropriate. (*Id.*, ¶ 23).

In her Complaint, Plaintiff alleges that Mr. Carolina's actions at this meeting amount to both sex and race discrimination; however, in her subsequent deposition, Plaintiff amended her allegations to clarify that she is only claiming to have suffered sex discrimination based on the May 18, 2011 muster meeting. (*Id.*, ¶ 24). Plaintiff further asserts that SBM discriminated against her and subjected her to a hostile work environment by not terminating Mr. Carolina after this incident and by allowing the two to interact at future muster meetings. (*Id.*, ¶ 25). Plaintiff admits, however, that after May 18, 2011, Mr. Carolina did not engage in any discriminatory activities or make any discriminatory comments toward Plaintiff. (*Id.*). Furthermore, Plaintiff admits that at future muster meetings Mr. Carolina always called on Plaintiff when her hand was raised and allowed her to speak. Additionally, Plaintiff admits that she has no knowledge regarding the amount or type of discipline SBM imposed on Mr. Carolina. (*Id.*, ¶ 25).

On May 18, 2011, following the muster meeting, Plaintiff spoke to Mr. Medina about the incident hoping to have SEIU file a grievance against Mr. Carolina. (Def. 56.1 Stmt., ¶ 31). Mr. Medina instructed Plaintiff to draft a memorandum and send it to Ignacio Velez ("Mr. Velez"), a grievance representative with SEIU. (*Id.*). On the same day, Plaintiff prepared a memorandum to Mr. Velez, stating that Mr. Carolina verbally attacked her during the muster meeting, but failing to provide any details regarding the specific statements Mr. Carolina made. On July 7, 2011, Mr. Velez sent a Complaint Form and corresponding letter to SBM on Plaintiff's behalf complaining of the May 18, 2011 incident between Plaintiff and Mr. Carolina and stating that if Plaintiff continues to be harassed, the union "will be forced to take action." (*Id.*, ¶ 33). Plaintiff responded to Mr. Velez on July 9, 2011, stating her discontent with the July 7, 2011 letter

because it fabricated facts and made allegations of harassment against Mr. Carolina outside of the May 18, 2011 incident that are not true. (*Id.*, ¶ 33).

In response to the May 18, 2011 incident, SBM conducted an investigation into Plaintiff's allegations of discrimination and harassment. (Def. 56.1 Stmt., ¶ 26). As part of the investigation, Mr. Carolina, who received a written warning, issued a public apology to the SBM employees at a subsequent muster meeting for his behavior during the May 18, 2011 meeting. Mr. Carolina also issued a personal apology to Plaintiff in a hallway in building 818. (*Id.*, ¶ 27). On June 8, 2011, SBM conducted a harassment training at the workplace, which focused on creating a respectful work environment. Both Plaintiff and Mr. Carolina attended this training. (*Id.*, ¶ 28). During the actual investigation, SBM interviewed Plaintiff and Mr. Carolina, requested that Plaintiff file a formal written complaint so a full investigation could ensue, and questioned several employees who witnessed or were in some way involved with the May 18, 2011 incident, including Mr. Early and Mr. Cortez. (*Id.*, ¶ 29). Plaintiff did not file a formal written complaint. (*Id.*, ¶ 29). In addition, on August 5, 2011, SBM arranged a formal meeting with Plaintiff, members from SBM's Human Resources Department, and SEIU representatives to discuss the May 18, 2011 incident. (*Id.*, ¶ 30). However, on August 4, 2011, Plaintiff submitted a letter to SBM's Human Resources Department stating that she refused to attend the August 5, 2011 meeting. (*Id.*). In particular, she stated: "I object to meeting with HR and my union at this junction and will just wait upon the EEOC to investigate and resolve this matter." (*Id.*, ¶ 30). Plaintiff did not attend the August 5, 2011 meeting. (*Id.*).

Plaintiff filed a complaint with the EEOC on September 14, 2011. (Def. 56.1 Stmt., ¶ 37). SBM received a copy of the EEOC Charge on September 30, 2011. (*Id.*). Janice Periolat, SBM's Human Resources Director, replied to Plaintiff's charge by filing a Position Statement with the

7

EEOC on October 31, 2011. The EEOC sent a redacted copy of the Position Statement to Plaintiff on February 28, 2012, providing Plaintiff with ten calendar days to respond. (*Id.*, ¶ 39). Plaintiff alleges that the copy of the Position Statement provided to her by the EEOC is unreliable, discriminatory, and retaliatory because certain parts of the document were redacted. (*Id.*, ¶ 40). In addition, Plaintiff asserts that the exhibits SBM submitted with the Position Statement contained falsified documents and were the result of witness tampering. (*Id.*). On March 14, 2012 Plaintiff sent a letter to the EEOC replying to SBM's position statement. (*Id.*).

On March 21, 2012, SBM sent Plaintiff a letter discussing Plaintiff's work absences due to medical reasons. (Def. 56.1 Stmt., ¶ 43). Plaintiff claims that SBM sent her this letter in retaliation for her filing of the EEOC charge. (*Id.*) (Wexler Decl., Ex. A, Dep. Tr. 200:16-203:23). One of the ways Plaintiff claims the letter was retaliatory was because the letter included a copy of SBM's medical leave documents in Spanish, rather than in English. (*Id.*). However, Plaintiff admits that two days later, on March 23, 2012, she received another letter from SBM containing the English version of SBM's family medical leave forms. (*Id.*). Plaintiff further alleges that SBM's March 21, 2012 letter was retaliatory because the letter stated that if SBM did not hear from Plaintiff by March 27, 2012, it would consider Plaintiff to have voluntarily retired from her employment with SBM. (*Id.*, ¶ 45). Additionally, Plaintiff claims that the letter was retaliatory because it did not mention a prior telephone conversation between Plaintiff and one of SBM's human resources representatives and because the identified contact person was out of the office at certain points between March 21, 2012 and March 27, 2012 as indicated in her automated email response message. (*Id.*). Despite these alleged retaliatory acts, including initially being mailed the Spanish version of SBM's family medical leave form, Plaintiff admits that SBM granted her all of the medical leave she requested. (*Id.*).

On March 26, 2012, the EEOC informed Plaintiff that it "is unable to conclude that the information establishes a violation of federal law on the part of [SBM]" and issued Plaintiff a Right to Sue letter, permitting her to seek action before the Court. (*Id.*, ¶ 41).

On August 18, 2012, Plaintiff sent a letter to Michael Fishman, the current President of SEIU, demanding that the union provide her with an attorney. (Def. 56.1 Stmt., ¶ 34). On October 11, 2012, SEIU attorney, Terry Meginniss, wrote a response to Plaintiff's August 18, 2012 letter, informing her that the union declined to represent her was because the union does not represent members who do not comply with meetings arranged by the union to assist the member in reconciling his or her grievance, i.e. Plaintiff's refusal to attend the August 5, 2011 meeting. (*Id.*, ¶ 35).

In light of the foregoing, Plaintiff commenced the instant cause of action on June 25, 2012. The Court construes Plaintiff's Complaint as asserting three causes of action: (1) gender and/or race discrimination under Title VII, (2) retaliation under Title VII, and (3) hostile work environment under Title VII. This Court's jurisdiction is premised on 28 U.S.C. § 1331. Defendants have now filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## LEGAL STANDARD

Summary judgment is appropriate when, drawing all reasonable inferences in the non-movant's favor, there exists no "genuine dispute as to any material fact" and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party is entitled to judgment as a matter of law when the non-moving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court must, however, consider all facts and their reasonable inferences in the light most favorable to the non-moving party. *See Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). If a reasonable juror could return a verdict for the non-moving party regarding material disputed factual issues, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 242-43 ("At the summary judgment stage, the trial judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

With this framework in mind, the Court turns now to Defendants' motion.

## ANALYSIS

A.   **Race/Gender Discrimination**

"Under Title VII, to make a prima facie showing of race discrimination, a plaintiff must demonstrate that: (1) he or she belongs to a protected class; (2) he or she was qualified for the position; (3) he or she was subject to an adverse employment action despite being qualified; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discrimination." *Coleman v. Pennsylvania State Police*, 2014 WL 1064379, at *5 (3d Cir. 2014) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973)); *see also Jones v. Sch. Dist. Of Philadelphia*, 198 F.3d 403, 410–411 (3d Cir. 1999).

Plaintiff's gender and/or race discrimination claim is premised on the incident which occurred at—and the circumstances following—the May 18, 2011 muster meeting. As stated

above, in her Complaint, Plaintiff alleged that Mr. Carolina's actions at this meeting amount to both sex and race discrimination; however, in her subsequent deposition Plaintiff amended her allegations to clarify that she is only claiming to have suffered sex discrimination based on the May 18, 2011 muster meeting. (Wexler Dec., Ex. A at 124:18-125:19). Plaintiff further asserts that SBM discriminated against her by not terminating Mr. Carolina after this incident and by allowing the two to interact at future muster meetings. (Compl., ¶ 8). Plaintiff admits, however, that after May 18, 2011, Mr. Carolina did not engage in any discriminatory activities or make any discriminatory comments toward Plaintiff. (Wexler Decl., Ex. A at 142:16-21). Furthermore, Plaintiff admits that at future muster meetings Mr. Carolina always called on Plaintiff when her hand was raised and allowed her to speak. (*Id.* at 179:2-11). Additionally, Plaintiff admits that she has no knowledge regarding the amount or type of discipline SBM imposed on Carolina. (*Id.* at 144:25-145:4). Finally, Plaintiff claims that she was also discriminated against by virtue of the "falsified" statement given by Tony Carolina concerning the May 18, 2011 incident. (Wexler Decl., Ex. D, Pl.'s Response to Interrogatory No. 11).

In the context of a Title VII gender discrimination claim, an adverse employment action is defined as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Pagan v. Gonzalez,* 430 Fed. Appx. 170, 172 (3d Cir. 2011) (citing *Durham Life Ins. Co. v. Evans,* 166 F.3d 139, 152–53 (3d Cir. 1999)). As best—and as liberally—as the Court can glean from the record, Plaintiff claims that she suffered—at most—one adverse employment action as a result of the foregoing alleged discrimination: she could "no longer participate in any of the muster meetings" following the May 18th incident because Tony Carolina was permitted to continue attending said meetings. (Wexler Decl., Ex. A at 137:23-

11

138:5). As a preliminary matter, the Court finds that such action—without more—does not rise to the level of an adverse employment action for purposes of a Title VII claim of discrimination because Plaintiff has identified no negative consequences that flowed from having missed any such meeting(s). Moreover, Plaintiff's own testimony confirms that she *was* permitted to attend muster meetings following the May 18th incident and, in fact, *did* attend such meetings. *See* Wexler Decl., Ex. A. at 179:2-11.

Defendants' motion for summary judgment as to this claim must be granted because there is no evidence in the record that Plaintiff was subjected to an adverse employment action, much less that the adverse employment action occurred under circumstances that give rise to an inference of discrimination. *See generally Coleman*, 2014 WL 1064379, at *5. To the contrary, evidence in the record confirms that Plaintiff was never disciplined, written up or suspended during the course of her employment. (Wexler Decl., Ex. A at 215:8-19). Nor does Plaintiff allege—much less prove—that she was fired, demoted, reassigned to a different position, or that her benefits changed in any way as a result of the May 18, 2011 incident—or the circumstances following the incident. In light of the foregoing, Plaintiff has failed to make out a prima facie case of gender (or race) discrimination under Title VII. Defendants' motion for summary judgment as to this claim is granted.

**B.     Retaliation**

To make a prima facie showing of retaliation, Plaintiff must establish that: (1) she participated in protected activity; (2) her employer took an adverse employment action after or contemporaneous with the protected activity; and (3) there is a causal link between the protected activity and the employer's adverse action. *See Kant v. Seton Hall Univ.*, 289 Fed. Appx. 564,

567 (3d Cir. Aug. 27, 2008) (noting that these are the three elements that a plaintiff must satisfy "[t]o advance a prima facie case of retaliation under section 1981, Title VII, or the NJLAD") (citing *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 286 (3d Cir. 2001)).

With respect to the second element, "a plaintiff claiming retaliation under Title VII must now show only that a reasonable employee would have found the alleged retaliatory actions 'materially adverse' in that they 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' " *Weiler v. R&T Mechanical, Inc.*, 255 Fed. Appx. 665, 668 n. 1 (3d Cir. 2007) (quoting *Burlington Northern and Santa Fe Railway Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 2412–13 (2006)); *see also Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006).

Plaintiff's claim of retaliation under Title VII is premised on the circumstances following her filing of a complaint with the EEOC on September 14, 2011. (Def. 56.1 Stmt., ¶ 37). In particular, Plaintiff maintains that Defendants retaliated against her in the following three ways after she engaged in the protected activity of filing a charge of discrimination with the EEOC:[4] (1) by placing falsified documents into her personnel file; (2) by submitting a fraudulent position statement (with fraudulent exhibits) to the EEOC; and (3) by sending Plaintiff a retaliatory letter on March 21, 2012. (Wexler Decl., Ex. D, Pl.'s Response to Interrogatory No. 13). During her deposition, Plaintiff clarified that items one and two, above, refer to the same category of allegedly fraudulent documents. (Wexler Decl., Ex. A at 192:4-17; 213:4-19).

---

[4] Defendants do not directly dispute that the filing of an EEOC charge constitutes protected activity for purposes of a Title VII retaliation claim. *See, e.g., Anderson v. General Motors*, 2009 WL 237247, *4 (3d Cir. Feb. 3, 2009) (analyzing retaliation claim under Title VII and noting that "it is undisputed that Anderson was engaged in a protected activity of filing an EEOC charge.").

As to the allegedly fraudulent documents, Plaintiff makes reference to only one particular aspect of any such documents that were allegedly fraudulent—namely, the statement that Miguelina Diaz had interviewed the Plaintiff. (Dexler Decl., Ex. A at 194:21-195:14). Plaintiff testified that Ms. Diaz never interviewed her. (*Id.*). Plaintiff also testified that there were some general inaccuracies in Defendants' position statement, such as "wrong dates," and that she disagreed with certain statements contained therein, such as "being able to hear from a glass door in the office." (*Id.* at 214:15-19). Beyond her mere suspicion, Plaintiff has come forward with no evidence substantiating her claim of fraud and/or establishing that any inaccuracies allegedly contained in Defendants' position statement (and/or corresponding exhibits) were intentional, as opposed to inadvertent. "Unsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010); *see also Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir. 1981). Absent any evidence establishing that any alleged inaccuracies in Defendants' position statement (and/or corresponding exhibits)—to the extent they even exist—were *intentional* as opposed to inadvertent mistakes, the Court finds that no reasonable employee would have deemed such inaccuracies to be "materially adverse."[5] In other words, based on the evidence in the record, no reasonable juror could conclude that a reasonable worker would have been dissuaded from making a charge of discrimination under these circumstances. *Weiler*, 255 Fed. Appx. at 668 n. 1.

---

[5] Even assuming, *arguendo,* that such alleged inaccuracies in Defendants' position statement to the EEOC did somehow amount to materially adverse action, Plaintiff has come forward with no evidence establishing a causal link between such alleged inaccuracies and her protected activity. *See generally Betts,* 621 F.3d at 252 ("Unsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment.").

As to the March 21, 2012 letter—discussing Plaintiff's work absences due to medical reasons—Plaintiff alleges that Defendants sent her this letter in retaliation for her filing of the EEOC charge. (Def. 56.1 Stmt., ¶ 43) (Wexler Decl., Ex. A, Dep. Tr. 200:16-207:9). In particular, Plaintiff claims the letter was retaliatory was because the letter included a copy of SBM's medical leave documents in Spanish, rather than in English. (Wexler Decl., Ex. A, Dep. Tr. 200:16-207:9). However, Plaintiff admits that two days later, on March 23, 2012, she received another letter from SBM containing the English version of SBM's family medical leave forms. (*Id.*). Plaintiff further alleges that SBM's March 21, 2012 letter was retaliatory because the letter stated that if SBM did not hear from Plaintiff by March 27, 2012, it would consider Plaintiff to have voluntarily retired from her employment with SBM. (*Id.*). Additionally, Plaintiff claims that the letter was retaliatory because it did not mention a prior telephone conversation between Plaintiff and one of SBM's human resources representatives and because the identified contact person was out of the office at certain points between March 21, 2012 and March 27, 2012 as indicated in her automated email response message. (*Id.*). Despite these alleged retaliatory acts, including initially being mailed the Spanish version of SBM's family medical leave form, Plaintiff admits that SBM granted her all of the medical leave she requested. (Wexler Decl., Ex. A, Dep. Tr. 207:25-208:9).

Plaintiff has failed to state a prima facie claim of retaliation under Title VII because there is no indication in the record that Plaintiff suffered any repercussions by virtue of the alleged retaliatory acts surrounding the March 21, 2012 letter. To the contrary, evidence in the record shows that: (1) the error of sending the medical leave documents to Plaintiff in Spanish was quickly remedied,[6] (2) Plaintiff received the correct medical leave forms within two days,[7] (3)

---

[6] (Wexler Decl., Ex. A at 207:2-9).

Plaintiff was able to apply for medical leave, notwithstanding the fact that her designated H.R. contact person was out of the office during the time period in which her medical leave forms were due;[8] and (4) Defendants granted Plaintiff's request for medical leave, in its entirety.[9] In light of the foregoing, the Court concludes that there is no evidence from which a reasonable fact-finder could conclude that a reasonable employee would have been dissuaded from complaining about unlawful conduct by virtue of the circumstances surrounding the March 21, 2012 letter.[10] *See, e.g., Ponton v. AFSCME*, 395 Fed. Appx. 867, 874 (3d Cir. 2010) (affirming district court's dismissal of employee's claim of retaliation under Title VII and noting that "Ponton did not suffer any repercussions, the incident was remedied and Ponton promptly received the route sheet, and, moreover, there is no evidence from which a reasonable fact-finder could conclude that a reasonable employee would have been dissuaded by the incident from complaining about unlawful conduct."). Defendants' motion for summary judgment as to this claim is granted.

### C. Hostile Work Environment

In order to make a viable hostile work environment claim under Title VII, a Plaintiff must establish "(1) that he or she suffered intentional discrimination because of race [or sex]; (2) the

---

[7] (Wexler Decl., Ex. A at 207:2-9).

[8] (Wexler Decl., Ex. A at 207:2-9).

[9] (Wexler Decl., Ex. A at 207:16-208:9).

[10] Even assuming, *arguendo*, that the circumstances surrounding the March 21, 2012 letter did somehow amount to materially adverse action, Plaintiff has come forward with no evidence establishing a causal link between such circumstances and her protected activity. *See generally Betts*, 621 F.3d at 252 ("Unsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment.").

discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same race in that position; and (5) the existence of respondeat superior liability." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1081 (3d Cir. 1996). Thus, to survive summary judgment, Plaintiff must present "sufficient evidence to give rise to an inference of discrimination by offering proof that her 'workplace [was] permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment,' . . . and the conduct [was] based on [her gender]." *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 278–79 (3d Cir. 2001) (quotation omitted). In assessing whether a work environment is indeed "hostile" or "abusive", a court should look at the totality of the circumstances. *Aman*, 85 F.3d at 1081 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 371 (1993)).

Plaintiff's hostile work environment claim appears to be based on the following alleged occurrences of discrimination: (1) Troy Carolina's actions at the May 18, 2011 muster meeting,[11] (2) the fact that Defendants "continually allowed [Plaintiff] to face her attacker [Troy Carolina] at [future] Muster meeting[s]",[12] and (3) the two times she was called "Pocahontas" by Troy Carolina, prior to the May 18, 2011 incident.

As to the first two incidents, there is no evidence in the record suggesting—much less showing—that Defendants' alleged actions were motivated by Plaintiff's race or sex. To the contrary, evidence in the record shows that Troy Carolina did not use foul language or make any female, sex, or race related comments during his exchange with Plaintiff during the May 18,

---

[11] (Wexler Decl., Ex. D, Plaintiff's Response to Interrogatory No. 11 ); (Wexler Decl., Ex. A at 137:5-138:2).

[12] (Compl., ¶ 8).

2011 muster meeting,[13] and that Plaintiff continued to attend the regularly scheduled muster meetings and was called on by Troy Carolina every time she raised her hand to speak.[14] Evidence in the record also shows that, in response to the May 18, 2011 incident, Defendants: (1) conducted an investigation into Plaintiff's allegations of discrimination and harassment;[15] (2) gave Troy Carolina a written warning and required him to issue an apology to Plaintiff;[16] and (3) conducted a "Respectful Workplace Training" at the workplace to review Defendants' anti-harassment procedures.[17] In light of the foregoing, the Court finds that Plaintiff has failed to show that she suffered intentional discrimination on the basis of her race or sex as a result of Troy Carolina's actions at the May 18, 2011 muster meeting,[18] or Defendants' response to said incident.

Similarly, the Court finds that Plaintiff has failed to show that she suffered intentional discrimination on the basis of her race or sex as a result of the two "Pocahontas" incidents. Plaintiff testified that during each incident she was wearing two braids. (Wexler Decl., Ex. A at 104:17-18; 106:14-16). She further testified that during the first incident, he called her

---

[13] (Wexler Decl., Ex. A at 127:6-14).

[14] (Wexler Decl., Ex. A at 178:21-179:11).

[15] (Periolat Decl., ¶ 7, Ex. C).

[16] (Periolat Decl., ¶ 13, Exs. C and H).

[17] (Periolat Decl., ¶ 12, Exs. D and G); (Wexler Decl., Ex. A at 168:8-169:25).

[18] Moreover, Plaintiff's own testimony suggests that any disparate treatment by Troy Carolina at the May 18, 2011 meeting was motivated by the contents of her input at the meeting—not by her gender. *See, e.g.,* Wexler Decl., Ex. A at 122:21-123:11) ("You had other co-workers that gave their opinions without incident. . . [M]y hand was raised. . . I waited for them to call on me and I asked my question and I did my input. No other female or other guy he attacked verbally like he did me.").

18

"Pocahontas" and then made physical contact with her hair. (Wexler Decl., Ex. A at 104:10-107:2). During the second incident, Plaintiff testified that Mr. Carolina pulled her hair, she responded by saying "don't pull my hair," and then Mr. Carolina responded to her by stating "I can pull your hair when I want to. You don't say nothing when Kason pulls your hair." (Wexler Decl., Ex. A at 110:5-24). Plaintiff has come forward with no other evidence relevant to the two Pocahontas incidents. Based on the limited evidence in the record, the Court finds that no reasonable fact-finder could conclude that the two isolated Pocahontas incidents were motivated by Plaintiff's race or gender and not by another unprotected reason. As such, these two offhand comments, without more, are not actionable under Title VII. *See, e.g., Abramson*, 260 F.3d at 280 (" 'Offhand comments, and [non-serious] isolated incidents' are not actionable under Title VII.") (quoting *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998)); *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005) ("In evaluating a hostile work environment claim under both Title VII and the LAD, we are mindful that 'offhanded comments, and isolated incidents (unless extremely serious)' are not sufficient to sustain a hostile work environment claim. Rather, the 'conduct must be extreme to amount to a change in the terms and conditions of employment. . . .' ") (citation omitted).

Having failed to establish that she suffered any intentional discrimination because of her race or gender, Plaintiff has failed to state a prima facie hostile work environment claim under Title VII.[19] Even considering the totality of the circumstances,[20] the Court finds that there is

---

[19] Even assuming, *arguendo*, that Plaintiff had established that she suffered intentional discrimination because of her race or gender, Defendants' motion for summary judgment would in any event be granted because Plaintiff has also failed to show, among other things, that any such acts of discrimination—Tony Carolina's actions during the May 18, 2011 muster meeting or during either of the Pocahontas incidents—were pervasive or severe, or that they detrimentally affected her work. *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–23 (1993) ("Whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances.

19

simply not enough evidence in the record upon which a reasonable jury could return a verdict in favor of the Plaintiff on her hostile work environment claim. Defendants' motion for summary judgment as to this claim is therefore granted.

## CONCLUSION

Based on the reasons set forth above, Defendants' motion for summary judgment is granted in its entirety.

An appropriate Order accompanies this Opinion.

Date:  June 10, 2014

s/ Jose L. Linares
Jose L. Linares
United States District Judge

---

These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."); see, e.g., Garges v. People's Light & Theatre Co., 529 Fed. Appx. 156, 162 (3d Cir. 2013) ("Much of the gender-related behavior involved one-time comments, and the heckling, humming, and privileged access to information did not involve gender. Clemens' frequent use of the word 'bitch' was directed at 'rude' customers, and, in any event, Garges did not allege that her work performance was detrimentally affected by this behavior.").

[20] See Fichter v. AMG Resources Corp., 528 Fed. Appx. 225, 232 (3d Cir. 2013) ("The totality of the circumstances test requires courts to 'evaluate the sum total of abuse over time' and prevents them from 'consider[ing] each incident in a vacuum.' ") (quoting Durham Life Ins. Co. v. Evans, 166 F.3d 139, 149, 155 (3d Cir.1999)).